**MONSANTO COMPANY Plaintiff**

v.

**Mitchell SCRUGGS, Eddie Scruggs, and Scruggs Family Farm Supply Defendants**

**No. Civ.A.3:00 CV 161 P-A.**

United States District Court, N.D. Mississippi, Western Division.

July 6, 2004.

Attorney, Tupelo, MS, Dennis C. Sweet, III, Sweet & Freese, Jackson, MS, Gary Myers, Gary Myers, Attorney, Oxford, MS, Michael Noel Watts, Robert Bradley Best, Holcomb Dunbar, Oxford, MS, Matthew T. Schelp Glennon P. Fogarty, Husch & Eppenberger, LLC, St. Louis, MO, Glennon P. Fogarty, Dutro E. Campbell, S. Christian Mullgardt, II, Husch & Eppenberger, LLC, St. Louis, MO, Paul Eldridge Barnes, Wise, Carter, Child & Caraway, Jackson, MS, for Defendants.

### MEMORANDUM OPINION

PEPPER, District Judge.

This cause is before the Court on Monsanto's Motion for Summary Judgment on Counts Two, Three, Four, Five and Eight of Plaintiff's Complaint (Monsanto's Patent Infringement Claims) [399–1] and the Defendants' Motion for Summary Judgment on Monsanto Company's Counts Two, Three, Four and Five of Plaintiff's Third Amended Complaint [517–1]. The Court, having reviewed the motion, the response, the briefs of the parties, the authorities cited and being otherwise fully advised in the premises, finds as follows, to-wit:

### FACTUAL BACKGROUND

Michael Noel Watts, Robert Bradley Best, Oxford, MS, Frank S. Thackston, Jr., Lake Tindall, LLPP, Greenville, MS, Charles Victor McTeer, Kimberly Georgette Jones, McTeer & Associates, Greenville, MS, Glennon P. Fogarty, Dutro E. Campbell, Michele L. Taylor, S. Christian Mullgardt, II, Adam E. Miller, Husch & Eppenberger, LLC, St. Louis, MO, Kenneth A. Letzler, Jonathan I. Gleklen, Michael D. Yeh, Arnold & Porter, Washington, DC, Susan K. Knoll, Howrey Simon Arnold & White, for Plaintiff.

Jim D. Waide, III, Waide & Associates, PA, Tupelo, MS, James L. Robertson, Wise, Carter, Child & Caraway, Lisa Scruggs Rohman, Lisa Scruggs Rohman,

Monsanto began research in the field of plant genetics in the early 1980's. During the course of that research, Monsanto scientists Robert Fralcy, Robert Horsch, and Stephen Rogers discovered it was possible to insert a foreign gene into a plant, get the plant to regenerate and to express the foreign gene. As a part of that discovery, they learned what DNA parts were essential to the creation of a transformed plant which incorporated the foreign DNA. Simply put, the synthetic gene required a promoter, a protein sequence of interest and a stop signal—all of which came from different sources. That invention is one of the subjects of the 5,352,605 patent (hereafter '605 patent).

Thereafter, Monsanto licensed the use of the 35S cauliflower mosaic virus (hereafter CaMV 35S) promoter disclosed in the '605 patent to numerous universities. Pursuant to such a license, Dr. Joan McPherson, a researcher with the University of British Columbia, undertook additional study of the CaMV 35S promoter. As a result of her work with the 35S promoter, she applied for and obtained patents numbered 5,164,316, 5,196,525 and 5,322,938 (hereafter the McPherson patents). The McPherson patents extended the art disclosed in the '605 patent in several ways; but for purposes of this case, one of its most important inventions was an enhanced 35S promoter. Monsanto subsequently purchased the McPherson patents and used their teachings in developing agricultural products for commercial sale.

Monsanto used the art taught in the '605 patent to develop genetically modified soybeans which are resistant to glyphosate herbicide.[12] The genetically modified soybeans are commercially marketed as Roundup Ready soybeans. The soybeans are resistant to Roundup because the plants produce a specific enzyme called 5–enolpyruvylshikimate–3–phosphate synthase (hereafter EPSPS). Monsanto used the same art to develop genetically modified cotton which is resistant to glyphosate herbicide. The genetically modified cotton is commercially marketed as Roundup Ready cotton. Monsanto utilized the teachings of both the '605 patent and the McPherson patents to develop a stacked trait cotton. This stacked trait cotton is not only glyphosate resistant, but it is also resistant to certain insects because the cotton plants produce a protein called bacillus thurengiensis (hereafter Bt) which is toxic to certain insects and other pests. The stacked trait cotton containing the Bt protein and the EPSPS protein is commercially marketed as Bollgard/Roundup ready cotton.

After developing the biotechnology described above and demonstrating its usefulness in agronomic production, Monsanto began licensing its technology to seed companies. However, it did not do so unconditionally. Instead, Monsanto imposed two provisos on the seed companies to which it licensed its Roundup Ready and Bollgard technology. First, Monsanto forbade seed companies from selling seed which contained Monsanto's biotechnology to growers unless the grower first signed one of Monsanto's technology license agreements. Second, seed so sold could only be used by growers to grow a single commercial crop, e.g., growers could not save seed produced

1. Glyphosate is the chemical name for the active ingredient in Roundup herbicide.

2. Lest the reader be misled by the truncated explanation, the development of transgenic crops involved a number of additional steps. After creating a synthetic gene, like those at issue here, scientists inserted the synthetic gene into plant cells through a process known as transformation.

Scientists use one of two methods to transform plant cells, a process involving agrobacterium or, alternatively, microprojectile bombardment. In the latter case, the scientists created a plant cell tissue culture. Then they coated small gold pellets with the synthetic gene. They loaded the pellets into a helium charged chamber, then fired them through a screen into the plant cells from the tissue culture. Only those synthetic genes shot into the nucleus of the plant cells and incorporated into the cell chromosome were transformed.

Thereafter, scientists selected the transformed plant cells and transferred them to a growth medium. After exposure to the growth medium, the plant cells multiplied and developed into plant shoots. After the whole plants developed, the scientists evaluated the transgenic plants to determine which one(s) displayed the best agronomic qualities, including but not limited to expression of the synthetic gene. Only after the scientists selected the most desirable "event" did wide scale seed production begin.

from a harvested crop for replanting during the following growing season.

In 1996, Roundup Ready soybeans became available to commercial growers. Although he never signed a license agreement,[3] Mitchell Scruggs purchased a small quantity of Roundup Ready 5601 Asgrow soybeans from Seeds, Inc. in Memphis. The seed was sufficient to plant approximately ten acres of soybeans. After the fall harvest, Mr. Scruggs retained the soybean seed from those ten acres; he cleaned it and saved it for planting during the 1997 crop season. He did likewise with the Roundup Ready soybean seed for all subsequent crop seasons up to the year 2000. By 2000, Scruggs had enough saved Roundup Ready soybean seed to plant more than 8,000 acres.

Bollgard/Roundup Ready cotton became available to growers in 1998. Again, Scruggs purchased only a small quantity of Delta & Pine Land Paymaster cotton seed containing the Bollgard and Roundup Ready traits—enough to plant no more than a few acres.[4] However, as with the soybean seed, Mr. Scruggs retained the cotton seed from the fields he planted with

3. All bags of Asgrow Roundup Ready soybean seed, manufactured from 1996 to the present, displayed the following notice:

> THESE SEEDS ARE COVERED UNDER U.S. PATENTS ... 5,352,605. THE PURCHASE OF THESE SEEDS CONVEYS NO LICENSE UNDER SAID PATENTS TO USE THESE SEEDS. A LICENSE FIRST MUST BE OBTAINED FROM MONSANTO COMPANY BEFORE THESE SEEDS CAN BE USED IN ANY WAY.

Also posted on the bags was a notice which read:

> This Asgrow variety is protected by the Plant Variety Protection Act (7 United States Code §§ 2321 et seq.) and/or the Patent Act (35 United States Code §§ 1 et seq.). The purchaser is authorized by Asgrow to plant this variety and use the resulting crop for food or sell the crop as grain. Asgrow does not authorize the use or sale of the crop as seed.
> UNAUTHORIZED PROPAGATION PROHIBITED

Exhibit N to Monsanto's Motion for Summary Judgment.

4. Mr. Scruggs never signed a license agreement in conjunction with his purchase of cotton seed. However, each and every bag of Paymaster stacked trait cotton seed sold since 1996 included the following notice on its label:

> PROPRIETARY GENE INFORMATION ● READ BEFORE OPENING THIS BAG
> The cottonseed contained in this bag contains the Bollgard gene from the common soil bacterium Bacillus thuringiensis var. kurstak (B.t.k.) which is effective in controlling certain lepidopteran cotton insect pests. This seed also contains the Roundup Ready gene which provides tolerance to Roundup herbicide when applied according to Monsanto instructions.
> You are required to carefully read the Grower Guide prior to planting this seed. You must plant and grow this seed in accordance with the Grower guide. Copies of the Grower Guide are available from your seed retailer, seed salesperson or Monsanto Company N3K, 800 North Lindbergh Blvd., St. Louis, MO 63167 1–800–523–2333.
> IT IS A VIOLATION UNDER FEDERAL PATENT LAW TO USE THIS SEED FOR ANY PURPOSE WITHOUT OBTAINING A LICENSE FROM MONSANTO CO.
> The Bollgard gene in this seed is protected under U.S. Patents 5,164,316, 5,196,525, 5,322,938, 5,352,605 and 5,500,365. The Roundup Ready gene in this seed is protected under U.S. Patents.... This variety is protected under the U.S. Plant Variety Protection Act. The Monsanto license does not authorize the grower to save or resell cottonseed produced from the seed in this bag for replanting. NOTE: Read the Limit of Warranty and Liability Statement in the Grower Guide before opening this bag. Opening this bag constitutes acceptance of those terms and conditions.
> WARNING; READ BEFORE OPENING. The seed in this bag contains patented technology. The user is NOT LICENSED to save any seed produced from this seed for replanting. If you are unwilling to comply with these terms, promptly return the unopened bag to the Seller.

Bollgard/Roundup Ready seed. He sent it to a facility in Missouri for cleaning and delinting; he then replanted the saved seed during the 1999 growing season. He did likewise for the 2000 growing season. By 2000, Scruggs had saved enough Bollgard/Roundup Ready cotton seed to plant in excess of 2000 acres.

After conducting an investigation into Mr. Scruggs' activities during the spring and summer of 2000, Monsanto filed the instant lawsuit, seeking recovery for the acts of Mitchell Scruggs and his affiliates, acts which, according to Monsanto, amounted to infringement of its rights under the '605 and McPherson patents.[5] The Scruggs defendants filed responsive pleadings denying infringement. The defendants also sought a declaration of invalidity with regard to the '605 and McPherson patents. After ample opportunity for discovery, Monsanto filed its Motion for Summary Judgment on Counts Two–Five of its Third Amended Complaint. The Scruggses not only responded in opposition to Monsanto's motion; they filed a cross-motion for summary judgment. The motions have been fully briefed and are ripe for decision.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment. *John v. State of La. (Bd. of T, for State C. & U.),* 757 F.2d 698, 712 (5th Cir.1985).

A judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role. *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 222 (5th Cir.1986). "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Id.* "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company, v. OKC Corporation,* 812 F.2d 265, 272 (5th Cir.1987). Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, ... all other contested issues of fact are rendered immaterial." *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. *Topalian v. Ehrman,* 954 F.2d 1125, 1138 (5th Cir.1992).

In making its determinations of fact on a motion for summary judgment, the Court

---

Exhibit E to Monsanto's Motion for Summary Judgment.

5. Monsanto also sued for infringement of another patent, the 5,633,435 patent. However, that patent is no longer at issue in this litigation.

must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin,* 736 F.2d 175, 178 (5th Cir.1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods,* 687 F.2d 117 (5th Cir.1982). The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalian,* 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden: the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John,* 757 F.2d at 708. "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants' motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion. *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.,* 672 F.2d 436, 440 (5th Cir.1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in

briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Rule 56(c), Fed.R.Civ.P. *See also Union Planters Nat. Leasing v. Woods,* 687 F.2d at 119.

While generally "[t]he burden to discover a genuine issue of fact is not on [the] court, (*Topalian,* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention—the court must consider both before granting a summary judgment.'" *John,* 757 F.2d at 712, *quoting Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980).

## LEGAL ANALYSIS

### I. Infringement of the '605 and McPherson Patents

 Patent infringement cases involve a two-step analysis: claim interpretation, which is a matter of law exclusively for the court, and infringement analysis, which is a question of fact. Claim interpretation requires the court to construe the patent's claims and to establish their meaning and scope. *See Markman v. Westview Instr., Inc.,* 52 F.3d 967 (Fed. Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)("A patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims"). In doing so, the court is to consider the specifications of the patent, its prosecution history and the prior art.

 Infringement analysis requires the court to compare the alleged infringer's product (in this case, the soybean and cotton in the defendants' fields) with the claims of the patent.[6] A finding of in-

---

**6.** This is in contrast to comparing the alleged infringing product with the patentee's product.

fringement requires that every limitation of a claim be met, either literally or by a substantial equivalent. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387–89 (Fed.Cir.1992). "A patent is infringed if a single claim is infringed." *Intervet America, Inc. v. Kee–Vet Lab. Inc.*, 887 F.2d 1050, 1055 (Fed.Cir.1989).

## A. Claims Construction

### 1. '605 Patent

Monsanto asserts infringement of claims 1, 2, 4 and 5 of the '605 patent. Before diving into the details of those claims, reference to the abstract of the '605 patent provides some context for the discussion which follows. The summary explains:

> In one aspect, the present invention relates to the use of viral promoters in the expression of chimeric genes in plant cells. In another aspect this invention relates to chimeric genes which are capable of being expressed in plant cells, which utilize promoter regions derived from viruses which are capable of infecting plant cells.... These chimeric genes have been shown to be expressed in plant cells. This invention also relates to plant cells, plant tissue and differentiated plants which contain and express the chimeric genes of this invention.

The specific claims at issue read as follows:

> We claim:
>
> 1. A chimeric gene which is expressed in plant cells comprising a promoter from a cauliflower mosaic virus, said promoter selected from the group consisting of a CaMV (35S) promoter isolated from CaMV protein-encoding DNA sequences and a CaMV (19S) promoter isolated from CaMV protein-encoding DNA sequences, and a structural sequence which is heterologous with respect to the promoter.

> 2. A chimeric gene of claim 1 in which the promoter is the CaMV (35S) promoter.

. . . . .

> 4. A plant cell which comprises a chimeric gene that contains a promoter from cauliflower mosaic virus, said promoter selected from the group consisting of a CaMV (35S) promoter and a CaMV (19S) promoter, wherein said promoter is isolated from CaMV protein-encoding DNA sequences, and a structural sequence which is heterologous with respect to the promoter.

> 5. A plant cell of claim 4 in which the promoter is the CaMV (35S) promoter.

Claim 1 of the '605 patent is broadly directed to a *chimeric gene*, which is expressed in plant cells, comprising a) a promoter element b) selected from the group consisting of either a 35S cauliflower mosaic virus promoter or a 19S cauliflower mosaic promoter, and c) a structural sequence of interest which is heterologous with respect to the promoter. The terms "chimeric" and "heterologous" indicate that the promoter and the structural sequence sought to be expressed derive from different species and do not, therefore, occur together in nature. The language relating to the promoter being isolated from CaMV protein encoding sequences explains that the promoter is being employed to drive expression of the heterologous sequence of interest rather than to drive expression of a CaMV viral protein as it does in the CaMV virus.

Claim 2 merely narrows the focus of the invention in claim 1, i.e., it specifies a *chimeric gene* from claim 1 in which the *chosen promoter is a 35S CaMV promoter* rather than a 19S CaMV promoter. Claim 4 claims *plant cells* which incorporate a chimeric gene meeting the elements of claim 1. Claim 5 narrows the focus of the invention in claim 4 by specifying *plant*

*cells* incorporating a chimeric gene meeting the elements of claim 2, e.g., those plant cells which are *comprised of a chimeric gene in which the chosen promoter is a 35S CaMV promoter* rather than a 19S CaMV promoter.

## 2. McPherson Patents

Monsanto also claims the defendants infringed certain of the claims in each of the McPherson patents.[7] The abstract for each of the McPherson patents reveals that the patents teach "[n]ovel transcription initiation regions that provide for enhanced transcription of a DNA sequence, particularly a plant sequence...."

The portions of the '938 patent in issue are claims 1, 2, and 3 of the '938 patent. Those claims read:

We claim:

1. A chimeric transcriptional initiation region comprising: as operably joined components (I) a tandemly duplicated CaMV 35S enhancer sequence comprising an AluI–HcoRV fragment of a CaMV 35 upstream region; and (ii) a promoter comprising an RNA polymerase binding site and an mRNA initiation site, wherein when a nucleotide sequence of interest is transcribed under the regulatory control of said chimeric transcriptional initiation region, the amount of transcription product is enhanced as compared to the amount of transcription obtained with a chimeric transcriptional initiation region comprising a single copy of said CaMV enhancer sequence and said promoter.

2. The chimeric transcriptional initiation region according to claim 1, wherein said promoter is obtainable from the upstream region of a plant virus gone.

3. The chimeric transcriptional initiation region according to claim 2, where-

in said plant virus gene is a CaMV 35S gene.

Monsanto also asserts infringement of the '525 patent. Claims 1, 2, 4 and 5 of that patent make the following claims:

1. A DNA construct having as components, (a) a transcription initiation region including (I) a tandemly duplicated CaMV 35S enhancer sequence comprising an AluI–EcoRV fragment of a CaMV 35 upstream region; and (ii) a promoter comprising an RNA polymerase binding site and an mRNA initiation site; (b) a nucleotide sequence of interest for transcription to mRNA; and (c) a termination region; wherein said components are operably joined.

2. The DNA construct according to claim 1, wherein said promoter is a T–DNA gene 7 or gene 5 promoter or a CaMV 35S promoter.

. . . . .

4. The DNA construct according to claim 1, wherein said sequence of interest is an open reading frame with an initiation codon for expressing a polypeptide of interest.

5. The DNA construct according to claim 1, wherein said promoter is a CaMV 35S promoter.

Monsanto also contends defendants infringed claims 1, 2 and 4 of the '316 patent. Those particular claims read as follows:

We claim:

1. A plant cell comprising:

a DNA construct having as components, (a) a duplicated CaMV 35S enhancer sequence comprising an AluI–EcoRV fragment of a CaMV 35 upstream region and (ii) a promoter comprising an RNA polymerase binding site

---

**7.** Because the inventions claimed in each of these patents are closely related, the Court's discussion of the proper construction for each of the patents follows a recitation of the claims in issue for each of the McPherson patents.

and an mRNA initiation site; (b) a nucleotide sequence of interest for transcription to mRNA; and (c) a termination region wherein said components are operably joined.

2. The plant cell according to claim 1, where said promoter is a T–DNA gene 7 or gene 5 promoter or a CaMV 35S promoter.

4. The plant cell according to claim 1, wherein said sequence of interest is an open reading frame with an initiation codon for expressing a protein of interest.

A cursory reading of the text and figures for each of the three patents reveals that they are essentially identical. However, upon closer scrutiny each of the patents asserts slightly different claims. The '938 patent claims a *chimeric transcriptional initiation region* which contains the enhancer sequence for the 35S promoter.[8]

The '525 patent claims a *DNA construct* which contains the enhancer sequence for the 35S promoter operably joined with a nucleotide sequence of interest and a termination codon.[9] The '316 patent claims *plant cells* containing the enhancer sequence for the 35S promoter operably joined with a nucleotide sequence of interest and a termination codon.[10]

## B. Infringement Analysis

### 1. Monsanto's Evidence of Infringement

Monsanto's evidence of infringement is staggering. The Scruggses admit purchasing Roundup Ready soybean seed in 1996 and Bollgard/Roundup Ready cotton seed in 1998. They admit they failed to obtain a license from Monsanto before planting the seed in 1996 and 1998. They also admit to saving soybean and cotton

---

**8.** Claim 1 specifies that the enhancer sequence is made up of tandemly duplicated AluI–EcoRV fragments from the upstream region of a 35S promoter operably joined with another promoter having an RNA polymerase binding site and an mRNA initiation site. Use of an enhanced promoter as described in claim 1 of the '938 patent results in a higher incidence of transcription for any nucleotide sequence of interest under the regulatory control of the chimeric transcriptional initiation region than would otherwise be obtained with a chimeric transcriptional initiation region incorporating only a single copy of the enhancer sequence joined with a promoter. Claims 2 and 3 of the '938 patent progressively narrow the source of the promoter from the broad category outlined in section (ii) of claim 1. Claim 2 limits the promoter to those obtainable from the upstream region of a plant virus gene. Claim 3 further limits the plant virus gene to that of a 35S promoter.

**9.** Claim 1 of the '525 patent specifics a DNA construct comprised of a) an enhanced promoter as described in claim I of the '938 patent; operably joined with b) a nucleotide sequence of interest for transcription to mRNA; and c) a termination component (stop signal). Claims 2 and 5 progressively

narrow the source of the promoter from the broad category of promoters described section (a)(ii) of claim 1. Claim 2 limits the promoter used in the DNA construct to one of three sources: a T–DNA gene 7 promoter, a T–DNA gene 5 promoter or a CaMV 35S promoter. Claim 5 the promoter used in the DNA construct to a CaMV 35S promoter. Claim 4 specifies that the nucleotide sequence of interest identified in section (b) of claim 1 be one which is an open reading frame with an initiation codon for expressing a polypeptide of interest.

**10.** Claim 1 of the '316 patent covers plant cells which contain the same DNA construct *identified in claim 1 of the '525 patent.* Claim 2 claims plant cells containing the '525 DNA construct, but limits the permissible source of the promoter to the same promoters specified in claim 2 of the '525 patent. Claim 4 of the '316 patent claims those plant cells in which the sequence of interest is an open reading frame with an initiation codon for expressing a protein of interest, e.g., the same sequences of interest specified in claim 4 of the '525 patent.

seed for their future planting needs through the 2000 growing season.

Beyond those admissions, Monsanto relies on the results of not one, but a series of three scientific tests, to demonstrate that the Scruggses' 2000 soybean and cotton crops contained Monsanto's patented Roundup Ready and Bollgard biotechnology.[11] The testing methods employed included polymerase chain reaction (hereafter PCR) testing, DNA sequencing and enzyme-linked immunosorbent assay (hereafter ELISA) analyses. The testing revealed that nearly all of the crop samples taken from the Scruggses' fields contained Monsanto's technology.

a. PCR Testing

The PCR tests utilized by Monsanto detect certain DNA sequences of interest. In this case, the tests employed two oligonucleotide DNA primers to search for the CaMV35S–CP4 construct (the Roundup Ready gene) and the Bt Cry1Ac construct (the Bollgard gene). If the constructs are present, the primers amplify the DNA sequence constructed and inserted by Monsanto. The primers anneal, or hybridize, to the inserted gene, allowing for DNA synthesis in the next phase of PCR. Subsequent cycles of PCR amplify the construct,

eventually leading to a DNA product detectable by gel electrophoresis.[12]

Of the two primers used to test defendants' soybeans, one primer for the PCR fragment was complementary to soybean DNA sequences lying just upstream from the CaMV35S–CP4 insertion site. A second primer detected PCR fragments including the 35S promoter and part of the CP4 EPSPS protein. Monsanto performed PCR analysis of 1,196 soybean samples from the Scruggses' fields. Of the samples tested, 1,145 yielded positive results.[13] Based on the PCR results, Monsanto expert Dr. Curtis Hannah concluded:

> Because the primers used are specific for the CaMV35S–CP4 construct and the resulting PCR products are of the predicted sixes to have arisen from the region of the CaMV35S–CP4 construct selected in amplification, I conclude from these data that the likelihood that these soybean samples lack Monsanto's patented technology is nil.

Exhibit J to Monsanto's Motion for Summary Judgment at p. 6.

Of the primers used to test the defendants' cotton, one primer detected a PCR fragment in the 5' region of the e35S-Bt Cry1 Ac gene while the other primer detected a fragment in the 3' portion of the

---

**11.** Monsanto also performed additional tests, the Southern Blot test and Taqman assays. However, the defendants moved to exclude the results of the Southern Blot and Taqman assays. The Court granted that motion. Accordingly, the Court nowise relies on the results of the latter two tests in deciding the present motion.

**12.** The primers match the amino acid sequence for the DNA sequences of interest exactly.

**13.** The competitive PCR method utilized by Monsanto also reduced the likelihood of obtaining any false positive results. The test involved the production of two PCR amplification products in a single reaction. One

product was from the transcend and the other was from an endogenous soybean or cotton gene. Both products competed for enzyme and nuclcoside in the PCR. Because of the competition, DNA sequences introduced as a low level contaminant could not have been amplified sufficiently to be detectable in the photographs of gels used to resolve the PCR products. By contrast, when the plant is transgenic the endogenous gene and transcend were present in similar numbers and thus were both sufficiently amplified in the competitive PCR reaction to be visible in the photographs of the gels used to resolve them. Exhibit B to Monsanto's Reply to Defendants' Opposition to Monsanto's Motion for Summary Judgment.

gene. Monsanto conducted PCR analysis of 388 cotton samples from the Scruggses' fields. Of the samples tested, 385 yielded positive results. Based on those test results, Dr. Hannah concluded that 99.2% of the cotton samples tested contained Monsanto's CaMVe35S–Bt Cry1 Ac gene.

### b. DNA Sequence Testing

After completing the PCR assays, Monsanto scientists performed DNA sequencing on the PCR product from certain of the soybean and cotton samples. Monsanto's Dr. Hannah compared the DNA sequences from the samples against the known sequences for Monsanto's Roundup Ready and Bollgard genes. The DNA sequencing data from the soybeans revealed the presence of Monsanto's chimeric CaMV35S–CP4 construct, e.g., a 35S CaMV promoter, a chloroplast transit peptide, and an EPSPS enzyme coding sequence. The DNA sequencing results on the sample cotton matched the DNA sequences for Bollgard cotton, e.g., the samples contained a chimeric CaMVe35S–Bt Cry1 Ac construct, e.g., an enhanced 35S promoter, the coding region for the Bt Cry1 Ac protein and a termination region.

### c. ELISA Testing

Monsanto also performed ELISA testing on a subsample of the soybean and cotton samples analyzed via PCR. ELISA tests detect the presence of a particular protein (i.e., a "heterologous nucleotide sequence of interest"). The assays only detect the presence of proteins actually expressed in the plants. This requires a functional DNA gene promoter, a coding region and signals for proper termination of transcription and processing of the RNA.

Monsanto tested soybeans taken from the Scruggses' fields for the presence of the CP4 EPSPS protein found in Roundup Ready soybeans. The ELISA results from the soybeans tested were consistent with the results of the PCR assays and DNA sequencing tests, e.g., the results were positive for the presence of the CP4 EPSPS protein. Monsanto's scientists also performed ELISA assays on the Scruggses' cotton to test for the presence of the Bt Cry1 Ac protein found in Bollgard cotton. The results were consistent with the results of the PCR and DNA sequence testing.

### 2. The Scruggses' Rebuttal

Notwithstanding Monsanto's arsenal of proof, the Scruggses urge that the plaintiff cannot prove either of two premises: 1) that Monsanto's Roundup Ready and Bollgard technology are covered by the '605 and McPherson patents; or 2) that the Scruggses' seeds fall within the gene sequences claimed by the patents-in-suit. Defendants attempt to show a genuine issue of material fact by launching a three-pronged attack on Monsanto's evidence of infringement.

██ First, the Scruggses claim that neither Monsanto's biotechnology nor the plants in their fields are covered by the '605 and McPherson patents. As evidence, they point to literature published by Monsanto's scientists for the proposition that only a portion of the CaMV 35S promoter is actually present in Roundup Ready soybeans. Defendants contend that because the '605 patent claims whole promoters, rather than fragments of promoters, neither Monsanto's technology nor the plants in their fields meet the required elements of claims 1, 2, 3, and 4 of the '605 patent. However, the evidence does not support the defendants' position. Instead, what the record shows is part of the *enhanced* promoter region cleaved off during the transformation process which resulted in event 40–3–2—the actual CaMV 35S promoter remained intact. The '605 patent claims only a CaMV 35S promoter, not

an enhanced promoter. Accordingly, this point of dispute is immaterial for summary judgment purposes.

■ Second, the defendants assert that the promoter sequences in Monsanto's Roundup Ready soybeans and Bollgard cotton do not match the sequences disclosed in the '605 patent. The only evidence the Scruggses offer is a comparison between the published scientific literature detailing the specific DNA sequence for the CaMV 35S promoter present in Roundup Ready soybeans and the gene sequence given for one the examples of CaMV 35S promoters in the specifications for the '605 patent. One again, however, the defendants' assertions are not borne out by the evidence. The '605 patent does not claim a specific gene sequence; instead, the patent clearly specifies that various isolates of CaMV 35S promoters may be used to practice the inventions claimed under the '605 patent. Furthermore, the gene sequence disclosed in Example 3 of the patent specification is from the CM4184 strain, whereas the CaMV 35S promoter employed in Monsanto's Roundup Ready soybean technology is from a different isolate, i.e., that of the CaMV Cabb–Bs. The evidence of record demonstrates that when the known promoter sequence for Roundup Ready soybeans is compared to the published sequence information for the CaMV Cabb–Bs 35S promoter, the two sequences do, in fact, match. Accordingly, this evidence is also insufficient to defeat Monsanto's properly supported summary judgment motion.

■ Last, the Scruggses contend that all of Monsanto's test results should be disregarded because Monsanto's testing does not comply with accepted scientific standards. With regard to the ELISA analysis, defendants claim that the assays aren't specific enough to distinguish between the CP4 EPSPS and BtCryl Ac proteins and other similar proteins-i.e., the presence of similar proteins *might* have caused the positive ELISA results in the test samples. Likewise, the Scruggses asset that the positive ELISA results *might* have been the product of contamination resulting from *possible* improper sampling and testing protocols on the part of Monsanto. Defendants employ a similar approach with regard to the PCR testing and DNA sequencing performed by Monsanto. That is, they assert that PCR testing detects only DNA fragments and that Monsanto's experts make bare unsupported assertions that the primers used in PCR testing will hybridize only to the gene sequences of interest. The defendants also fall back on their contamination theory again, speculating that "*if* even *one molecule* of contamination exists in a sample ... the [PCR] amplification process will produce millions of amplicons of that molecule of contamination." Building on that theory, the Scruggses urge that the DNA sequencing tests should be disregarded because they are founded on the flawed PCR data, e.g., the DNA sequencing results *might* simply reflect DNA from contamination, not from the Scruggses' crops. However, in view of the fact that the Scruggses have offered no evidence to support their hypotheses, no reasonable trier of fact could find in their favor. Evidence based solely on surmise is insufficient to defeat summary judgment.[14]

■ The only question remaining is whether the crops in the defendants' fields meet the limitations of the patent claims at issue. Monsanto's Roundup Ready (soy-

14. Monsanto's rebuttal thoroughly addresses each of the criticisms raised by the defendants through Dr. Folk, Review of the record as a whole fails to convince the court that a rea-sonable trier of fact could find fault with Monsanto's sampling, laboratory protocols, the testing or the results obtained therefrom.

bean and cotton) and Bollgard (cotton) products are the only commercially available seed varieties which contain the CP4 EPSPS and BtCry1 Ac proteins. Likewise, they are the only products which employ the CaMV 35S promoter and/or the enhanced e–35S promoter. The test results point to a single, inescapable conclusion; the crops in the Scruggses' fields contained Monsanto's technology as claimed in its patents numbered '605, '938' 525 and '316.

With regard to the '605 patent, the soybeans found in the defendants' fields meet every element of claims 1, 2, 3 and 4. The tests conducted by Monsanto revealed the presence of a chimeric gene which consisted of a 35S promoter derived from the Cabb B–S strain of a cauliflower mosaic virus and a CP4 EPSPS protein derived from a bacterial strain called Agrobacterium CP4. Because the 35S promoter and the protein differ, the protein is heterologous with respect to the promoter.

With regard to the '605 and '938 patents, the cotton found in the Scruggses' fields meet every element of the claims at issue. The tests conducted by Monsanto revealed the presence of a chimeric gene with a transcription initiation region composed of a tandemly duplicated CaMV 35S enhancer sequence made up of an AluI–EcoRV fragment of a CaMV 35 upstream region and a CaMV 35S promoter. The transcription initiation region was operably joined to a Bt1 Cry1 Ac protein sequence which was heterologous with respect to the CaMV 35S promoter.

The evidence of record also establishes that the defendants' cotton meet all of the necessary elements for the claims at issue in the '525 and '316 patents—c.g., the DNA construct and plant cells containing the DNA construct described above.[15] Be-

cause Monsanto has carried its burden of proving infringement of the '605, '938, '525 and '316 patents, the plaintiff is entitled to judgment as a matter of law on claims 2, 3, 4 and 5 of the Third Amended Complaint-unless the defendants can demonstrate the existence of a genuine issue of material fact as to one or more of their defenses.

## II. Analysis of the Scruggses' Defenses

The Scruggses asserted numerous defenses to Monsanlo's infringement action: lack of proper notice of the patents-in-suit; the existence of an implied license to use Monsanlo's technology; the doctrines of first sale/patent exhaustion, violation of the PVPA, patent misuse and patent invalidity. The Court will address each of these defenses in turn.

### A. Notice of Patents

 Title 35, section 287 of the United States Code requires a patent holder to inform the public of the patent status of an article in commerce. The patentee may do so in one of two ways: by providing actual notice to the infringer; or by constructive notice by marking the article with the patent number. *SRI International, Inc. v. Advanced Technology Laboratories, Inc.,* 127 F.3d 1462, 1469 (Fed. Cir.1997). Monsanto urges that it satisfied the requirements of § 287 by providing the appropriate patent markings on all bags of Roundup Ready soybean and cotton seed and on its Bollgard cotton seed bags. In light of defendants' failure to contest this assertion, the Court finds Monsanto's motion well-taken with regard to the Scruggses' lack of notice defense.

### B. Implied License

 An alleged infringer who asserts an implied license as an affirmative

---

**15.** The DNA sequencing performed also revealed the presence of the termination region

necessary to meet the elements of the claims at issue in the '525 and '316 patents.

defense to an infringement action bears the burden of proving the existence of that license. *Carborundum Co. v. Molten Metal Equipment Innovations, Inc.*, 72 F.3d 872, 878 (Fed.Cir.1995)(citing *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924 (Fed.Cir.1984)). Any language used by the owner of the patent or any conduct on his part exhibited to another, from which the other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license. *Wommack*, 715 F.2d at 969. Whether such a license exists may be decided as a matter of law where the applicable facts are not in dispute.

 In this case, Monsanto's actions conclusively establish that defendants had no implied license to use Monsanto's patented biotechnology. It is undisputed that Monsanto requires all licensee seed companies to place the following notice and term of sale on all bags of seed containing Monsanto's patented biotechnology:

> THESE SEEDS ARE COVERED UNDER U.S. PATENTS ... THE PURCHASE OF THESE SEEDS CONVEYS NO LICENSE UNDER SAID PATENTS TO USE THESE SEEDS. A LICENSE MUST FIRST BE OBTAINED FROM MONSANTO COMPANY BEFORE THESE SEEDS CAN BE USED IN ANY WAY.

This notice vitiates any assertion that Monsanto induced the Scruggses to rely upon any perception that they had a right to use the soybean and/or cotton seed for even one season without first obtaining an express license from Monsanto.

As a further matter, the record is clear that Monsanto only authorizes the sale of its patented biotechnology to licensed growers. Accordingly, the defendants cannot claim any rights to use Monsanto's seed technology merely because the retailers from whom the defendants obtained their seeds did not first require the Scruggses to execute a license agreement. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) ("With Ford lacking authority to make and sell, it could by its sale of the cars confer on the purchasers no implied license to use, and their use of the patented structures was without authority and infringing under s 271(a) ... where use infringes, repair does also, for it perpetuates the infringing use."); *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175, 181 58 S.Ct. 849 (1938). *See also AMJUR PATENTS* § 1208 ("Moreover, a purchaser from the licensee of a patented machine takes the risk, as against the real owner, whether the title of the seller is such as to enable him to make a valid conveyance; notice is not required."). Defendants had no reasonable expectation that they could use Monsanto's patented biotechnology unless they first obtained a license.[16] Accordingly, Monsanto is entitled to judgment as a matter of law on the defendants' implied license defense.

### C. First Sale/Patent Exhaustion

 Monsanto also seeks summary judgment on the defendants' defense of first sale/patent exhaustion. The premise of this doctrine is that the first sale by a patentee of an article embodying his inven-

---

**16.** In *Monsanto v. Trantham*, 156 F.Supp.2d 855, 870 (W.D.Tenn.2001), the United States District Court for the Western District of Tennessee employed the same analysis in concluding that the alleged infringer had no implied license to utilize Monsanto's technology:

"Defendant was on notice at the time of the sale that in order to avoid infringing on Plaintiff's patents, he had to obtain a license from Plaintiff prior to use. Under these circumstances, no grant of implied license should be inferred...."

tion exhausts his patent rights in the article. *See Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 924 (Fed.Cir. 1984) (citing *United States v. Univis Lens Co.,* 316 U.S. 241, 250–52, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)). However, in making this claim, the defendants presuppose an unrestricted sale of the patented 'technology. As previously noted by the Court, Monsanto never made an unrestricted sale of its seed technology. The Federal Circuit recognized some time ago that where a patentee imposes restrictive terms of sale, there is no right to unrestricted use of the patented product. *Mallinckrodt Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed. Cir.1992). Application of these legal principles to the present case produces a clear result.

Monsanto licensed its technology to seed companies with a proviso: subsequent sales of seed containing Monsanto's transgenic trait must be limited to growers who obtain a license from Monsanto *and* for only a single growing season. Absent a showing that Monsanto's licensing provisions violate some other law or policy, they are enforceable.[17] Since Monsanto never made an unrestricted sale of its technology, the doctrine of first sale/patent exhaustion afford no protection to the Scruggses.

### D. Violation of the PVPA

Plaintiff also seeks summary judgment on the defendants' Plant Variety Protection Act (hereafter PVPA) counterclaim/defense. Monsanto's brief relies on the United States Supreme Court's decision in *J.E.M. AG Supply, Inc., d/b/a*

*Farm Advantage, Inc. v. Pioneer Hi–Bred International, Inc.,* 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001) (holding that utility patents for plants, plant parts, and seeds are valid under 35 U.S.C. § 101, and therefore, patent holders may limit or restrict use of their plant technology). Defendants conceded at oral argument that the *J.E.M. AG Supply* decision forecloses their claim that Monsanto violated the provisions of the PVPA and that they merely wish to preserve their argument for appeal. In light of the controlling legal precedent, the Court concludes that Monsanto is entitled to judgment as a matter of law on the defendants' PVPA counterclaim/defense.

### E. Patent Misuse

■ Monsanto also seeks summary judgment on the defendants' patent misuse counterclaim.[18] Here, plaintiff points out that the defendants' effort to convert the affirmative defense of patent misuse into a claim for "compensatory damage, costs, and attorneys' fees" is contrary to law. *See B. Braun Medical, Inc. v. Abbott Laboratories,* 124 F.3d 1419, 1428 (Fed.Cir. 1997)("In this regard, contrary to the district court's opinion, monetary damages may not be awarded 'under a declaratory judgment Counterclaim based on patent misuse,' ... [i]n other words, the defense of patent misuse may not be converted to an affirmative claim for damages by restyling it as a declaratory judgment Counterclaim."). Defendants conceded Monsanto's position on this issue at oral argument.

---

**17.** Defendants have challenged the plaintiff's licensing restrictions and other marketing practices on grounds that they violated federal antitrust laws and constituted patent misuse. Those claims and defenses will be discussed more thoroughly in a separate Memorandum Opinion addressing Monsanto's Motion for Summary Judgment on Counts Six, Seven, Eight and Nine.

**18.** Subsection E. herein addresses only the defendants' characterization of patent misuse as a counterclaim. The merits of the Scruggses' patent misuse defense is addressed more thoroughly in a separate Memorandum Opinion addressing Monsanto's Motion for Summary Judgment on Counts Six, Seven, Eight and Nine of Defendant's Counterclaim. See note 17 *supra.*

Accordingly, the Court finds that Monsanto is entitled to summary judgment on Count Eight of the Scruggses' Counterclaim.

### F. Patent Invalidity

Monsanto also seeks summary judgment on the Scruggses' defense of patent invalidity. The defendants urge the Court to find the patents in suit invalid for failure to meet the written description and enablement requirements of 35 U.S.C. § 112.

■■■ A patent is entitled to a presumption of validity. 35 U.S.C. § 282. Its validity endures until a challenger carries its burden of persuading the decisionmaker that the patent can no longer be accepted as valid. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983). The burden of proving invalidity lies with the party who attacks a patent's validity. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987). That burden is one of clear and convincing evidence. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985). Where a defendant cannot meet that burden, the court need only so state. It is not necessary for the Court to "validate" the patents in suit.[19]

Section 112 of the patent laws requires that an applicant for a patent produce certain minimum information in the application:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention. 35 U.S.C. § 112.

■■■ The Scruggses invalidity argument targets the "written description" requirement of § 112. The defendants urge the Court to conclude that the written description of the patented inventions is deficient because the specification fails to detail the specific gene sequences claimed to be covered under the patent. They rely on the proposition that an adequate written description of genetic material "requires a precise definition, such as by structure, formula, chemical name, or physical properties." *Enzo Biochem, Inc. v. Gen–Probe Inc.*, 296 F.3d 1316, 1324 (Fed.Cir.2002). They also contend that Monsanto's patents do not meet a more lenient version of the written description requirement for genetic materials, e.g., that of disclosing relevant identifying characteristics "coupled with a known or disclosed correlation between function and structure, or some combination of such characteristics." *Id.*

Monsanto's motion and supporting briefs focus on the purpose of the written description requirement-i.e., that of conveying the information that an applicant invented the claimed subject matter and, that the applicant was in possession of the claimed invention as of the filing date of the application. *In re Barker*, 559 F.2d 588, 592 (Cust. & Pat.App.1977); *In re Wertheim*, 541 F.2d 257, 262 (Cust. & Pat. App. 1976). Furthermore, they clarify the Federal Circuit's teachings in *Enzo.* That is, not *all* functional descriptions of genetic material necessarily fail to meet the written description requirement; the requirement may be satisfied if in the knowledge of the art, the disclosed function is sufficiently correlated to a particular, known

---

**19.** This is because the same patents might be shown to be invalid under another record.

structure. Plaintiff also points out that the cases cited by the Scruggses apply only in cases where the claimed subject matter is defined solely by its function or the desired result of its use. *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed.Cir.1997); *Enzo*, 296 F.3d at 1322. Monsanto avers that its claims do not rely merely on the function or biological activity to define the subject matter, instead, they claim subject matter defined in terms of detailed, relevant identifying characteristics. Also, because the biological materials utilized by the patents are not new or unknown, there is no likelihood that those with ordinary skill in the art would misunderstand the claims.[20] Finally, Monsanto asserts that, with regard to the '605 patent, the patent specification references sources of various strains of the cauliflower mosaic virus which contain the 35S promoter; many of those strains have been deposited with and are available at the American Type Culture Center. Monsanto contends that those deposits comport with the § 112 written description requirement as well. *Enzo Biochem, Inc.* v. Gen-Probe Incorporated, 323 F.3d 956, 965 (Fed.Cir.2002).

After examining the patent specification, especially in light of the breadth of the claims, the Court concludes that Monsanto's patents do comply with the written description requirement. The patents never claim a particular gene sequence as a requisite to the inventions claimed nor do they claim to have invented, or discovered, any previously unknown DNA. Instead, as described in the section of the opinion dealing with claims construction, the patents teach how to create chimeric genes using plant virus promoters to express proteins derived from unrelated biologic sources. The patent specifications

clearly describe promoters already known to those skilled in the art. Publication of the specific gene sequences for each possible embodiment of the claimed inventions was simply unnecessary.

The defendants further reason that the lack of specific sequencing information affects enablement. They claim that there are millions of possible permutations of nucleotide sequences for the CaMV promoters utilized by Monsanto; and that relatively minor changes in sequencing may have a dramatic effect on the promoter's function. Therefore, they claim, the specification fails to put the public in possession of the invention. The defendants also aver that the sheer breadth of Monsanto's patent claims should result in a finding of invalidity. In response, Monsanto points to the lack of any proof to support such a claim. *Satis Vacuum Industries Vertriebs A.G. v. Optovision Technologies, Inc.*, No. 3:99–CV–2147–M, 2001 U.S. Dist. LEXIS 15043, at *46 (N.D.Tex. July 26, 2001) (granting summary judgment in favor of plaintiff on affirmative defense of patent invalidity where nothing in the record showed that defendant or anyone else attempted to replicate the patented device, thus rendering defendant's claim of lack of enablement speculative).

Having reviewed the materials submitted, along with the applicable legal authorities, the Court is persuaded that the defendants have not come forward with evidence from which a reasonable trier of fact could find in their favor on their defense of patent invalidity-especially in view of the heavy burden they would have to carry. Accordingly, the Court finds that Monsanto is entitled to judgment as a matter of law on the Scruggses' patent invalidity defense.

---

**20.** The DNA sequence of the 35S promoter disclosed and included as a limitation in Monsanto's patent claims, is identical to that of CaMV Cabb B–S [Franck et al. (1980) Cell 21:285–294; GenBank accession number V00141].

## CONCLUSION

Based on the foregoing facts and analysis, the Court finds that the plaintiff's Motion for Summary Judgment on Counts Two, Three, Four, Five of Plaintiff's Complaint is well-taken and should be granted. It follows, therefore, that the defendants' Motion for Summary Judgment on Counts Two, Three, Four and Five of Plaintiffs' Third Amended Complaint is not well-taken and should be denied. An Order will issue accordingly.

## ORDER

This cause is before the Court on the plaintiff's Motion for Summary Judgment on Counts Two, Three, Four, Five and Eight of Plaintiff's Complaint (Monsanto's Patent Infringement Claims) [399–1]. The Court, having considered the motion and being otherwise fully advised in the premises, finds as follows, to-wit:

In accordance with the Memorandum Opinion entered this day, the Court finds that the plaintiff's Motion is well-taken and should be sustained.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the plaintiff's Motion for Summary Judgment on Counts Two, Three, Four, Five and Eight of Plaintiff's Complaint (Monsanto's Patent Infringement Claims) [399–1] is well-taken and should be, and hereby is, GRANTED.

## ORDER

This cause is before the Court on the defendants' Motion for Summary Judgment on Monsanto Company's Counts Two, Three, Four and Five of Plaintiff's Third Amended Complaint [517–1]. The Court, having considered the motion and being otherwise fully advised in the premises, finds as follows, to-wit:

In accordance with the Memorandum Opinion entered this day, the Court finds that the defendants' Motion is not well-taken and should be denied.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the defendants' Motion for Summary Judgment on Monsanto Company's Counts Two, Three, Four and Five of Plaintiff's Third Amended Complaint [517–1] is not well-taken and should be, and hereby is, DENIED.